Maisto v State of New York (2023 NY Slip Op 05637)

Maisto v State of New York

2023 NY Slip Op 05637

Decided on November 9, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:November 9, 2023

535287
[*1]Larry J. Maisto et al., Appellants,
v
State of New York, Respondent.

Calendar Date:September 7, 2023

Before:Garry, P.J., Lynch, Pritzker, Reynolds Fitzgerald and Powers, JJ.

DeGraff, Foy & Kunz, LLP, Albany (David F. Kunz of counsel) and The Biggerstaff Law Firm, LLP, Slingerlands (Robert E. Biggerstaff of counsel), for appellants.
Letitia James, Attorney General, Albany (Jonathan D. Hitsous of counsel), for respondent.

Garry, P.J.
Appeal from an order of the Supreme Court (Kimberly A. O'Connor, J.), entered April 7, 2022 in Albany County, which determined certain procedure to be followed upon remittal.
This school financing case returns to us for a fourth time (196 AD3d 104 [3d Dept 2021]; 154 AD3d 1248 [3d Dept 2017]; Hussein v State of New York, 81 AD3d 132 [3d Dept 2011], affd 19 NY3d 899 [2012]) and takes place against the backdrop of a series of Court of Appeals cases addressing what is required of defendant in order to meet its obligation under NY Constitution, article XI, § 1 (hereinafter the Education Article) to provide the children of this state with the opportunity to obtain "a sound basic education" (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 48 [1982], appeals dismissed 459 US 1138, 1139 [1983]; see generally Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d 14 [2006] [hereinafter CFE III]; Campaign for Fiscal Equity v State of New York, 100 NY2d 893 [2003] [hereinafter CFE II]; Campaign for Fiscal Equity v State of New York, 86 NY2d 307 [1995] [hereinafter CFE I] [hereinafter collectively referred to as the CFE cases]). In CFE II, the Court of Appeals held that children in the New York City School District were being deprived of that opportunity and accordingly directed defendant to first ascertain the actual cost of providing a sound basic education in New York City and then ensure, by means of reforms to the then-current system of financing school funding and managing schools, that every school in New York City would have the resources necessary to provide that opportunity to every child (Campaign for Fiscal Equity v State of New York, 100 NY2d at 930). In response to that directive, defendant elected to address school funding and management on a statewide basis (see Executive Order [Pataki] No. 131 [9 NYCRR 5.131]), ultimately enacting the Budget and Reform Act of 2007 (see L 2007, ch 57, codified at Education Law § 3602). The act notably included a program known as Foundation Aid, which, among other things, established a new formula for calculating state aid to school districts (see Education Law § 3602 [4], as amended by L 2007, ch 57). As enacted, Foundation Aid would increase the state share of school funding by $5.49 billion annually once fully implemented over a four-year period. The methodology underlying that formula, insofar as it was to be used to estimate the cost of providing a sound basic education in New York City, was held to be rational in CFE III (see Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 20, 30-31).[FN1] Foundation Aid was fully distributed in the 2007-2008 and 2008-2009 school years; however, faced with a $20.1 billion shortfall for the 2009-2010 budget following the 2008 recession, defendant froze, and then later significantly reduced, its education spending levels.
Plaintiffs, the parents of minor students attending one of the subject small city school districts during the [*2]relevant years, commenced this action in 2008 seeking, among other relief, declarations in their favor under the Education Article. When this case was last before us, we conducted a de novo review of the evidence following a lengthy nonjury trial regarding the 2006-2007 through 2013-2014 school years and held that plaintiffs had established a constitutional violation with respect to the at-risk student population in each of the districts (196 AD3d at 152). We therefore remitted the matter to Supreme Court for further proceedings and for " '[defendant] to craft an appropriate response, subject to judicial review' " (id. at 153, quoting Aristy-Farer v State of New York, 29 NY3d 501, 515 [2017]). On remittal, the parties attempted to draft a proposed joint order regarding how the matter should proceed but ultimately reached an impasse. The court accordingly directed them to independently submit their proposals. Upon review of the proposals, the court issued a letter order setting forth, among other things, the next steps in the remedial phase of this litigation. Disagreeing with the court's intended approach, plaintiffs appeal.[FN2]
Although not initially raised by the parties, we must address a threshold issue of appealability. Apart from limited exceptions not applicable here (see CPLR 5701 [b]), an appeal may be taken to this Court as of right "from an order . . . where the motion it decided was made upon notice" and one of eight, broad statutory circumstances exists (CPLR 5701 [a] [2]). Here, there was no noticed motion made following remittal (see generally CPLR 2214 [a]). The subject order was instead the product of letter briefs submitted in response to Supreme Court's request. Although this procedure was arguably the functional equivalent of a noticed motion, the Court of Appeals has rejected such a subjective evaluation in favor of the certainty that the notice of motion procedure affords (see Sholes v Meagher, 100 NY2d 333, 335 [2003]). We therefore must conclude that the order before us is not appealable as of right (see Hogan v Zibro, 190 AD3d 1124, 1124 [3d Dept 2021]; Dumond v New York Cent. Mut. Fire Ins. Co., 166 AD3d 1554, 1554-1555 [4th Dept 2018]; Carney v Carney, 160 AD3d 218, 223 [4th Dept 2018]; see generally Novastar Mtge., Inc. v Melius, 145 AD3d 1419, 1420 [3d Dept 2016]). Nevertheless, considering the circumstances of this tremendously protracted litigation, we grant plaintiffs' belated request to treat the notice of appeal as an application for leave to appeal and further grant the application (see CPLR 5701 [c]).
We begin by recognizing that Supreme Court has only just begun to undertake the remedial phase of this litigation and has not made a comprehensive determination as to its parameters. The court has merely directed that defendant submit a brief, along with supporting documentation, regarding the historical and current levels of education funding for each of the subject school districts, from both state and federal sources[*3], and indicate whether that funding has addressed the constitutional violations found by this Court. The plaintiffs will then have the opportunity to submit a brief on those points in response, along with any supporting documentation that they deem necessary. The court was careful to state that it would not be holding a hearing "[a]t this time," which of course in no way forecloses that possibility upon consideration of the submissions.
This process matches the remedial protocol outlined by the Court of Appeals in the CFE cases. In CFE II, the Court of Appeals recognized that, although "it is the province of the Judicial branch to define, and safeguard, rights provided by the . . . State Constitution, and order redress for violation of them," courts "have neither the authority, nor the ability, nor the will, to micromanage education financing" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 925). Instead, "the manner by which the [s]tate addresses complex societal and governmental issues is a subject left to the discretion of the political branches of government" (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 28 [internal quotation marks and citations omitted]). Thus, in CFE II, the Court of Appeals ordered defendant "to ascertain the cost of a sound basic education in New York City" and "present evidence of its reforms, both predating CFE II and following CFE II" (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 29, 30 [internal citation omitted]; see Campaign for Fiscal Equity v State of New York, 100 NY2d at 927, 930). Supreme Court (DeGrasse, J.) was tasked only with "determin[ing] whether [the reforms] satisfied [the Court's] directives" (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 29). In CFE III, the Court of Appeals made clear that judicial review of defendant's proposal was limited to whether it was "rational" or "reasonable" (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 27, 29, 30; see Aristy-Farer v State of New York, 29 NY3d at 507-508).
In plaintiffs' view, in order to receive "the same relief as the CFE plaintiff[s]," they are entitled to a preliminary hearing on and determination by Supreme Court (O'Connor, J.) of the specific inputs [FN3] needed in the subject districts to provide each district's at-risk students the opportunity to obtain a sound basic education. They assert that, without a determination of the exact inputs required and the cost to provide those inputs, there can be no meaningful review of any financial remedy proffered by defendant, highlighting that, following CFE II, Supreme Court (DeGrasse, J.) appointed a panel of referees to report on the adequacy of defendant's remedy. However, in CFE III, the Court of Appeals expressly held that the court had "erred by, in effect, commissioning a de novo review of the compliance question," as "[t]he role of the courts is not . . . to determine the best way to calculate the cost of a sound basic [*4]education . . . , but to determine whether [defendant's] proposed calculation of that cost is rational" (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 27). Again, "[defendant], not Supreme Court, was ordered to ascertain the cost of a sound basic education" (id. at 30; see 196 AD3d at 153).
Contrary to plaintiffs' suggestion, it is not impossible to evaluate the rationality of a financial remedy without an itemized understanding of the needs of the subject districts. This is illustrated in the CFE cases. As previously noted, although the adequacy of the funding proposed for schools outside of New York City was not at issue in the CFE cases, the costing-out of a sound basic education was undertaken on a statewide basis following CFE II (see L 2007, ch 57). The New York State Commission on Education Reform entertained three models to arrive at that cost, two of which are presently relevant (see New York State Commission on Education Reform, Final Report, Ensuring Children an Opportunity for a Sound Basic Education at 22 [Mar. 29, 2004]). One model was similar to the approach that plaintiffs now urge, referred to as the professional judgment model, which "uses panels of education professionals to determine the key elements needed in a school to produce the desired results. Costs are then assigned to the elements to determine an overall cost figure. This model uses a hypothetical approach to creating model schools" (Final Report at 22). The second model — the one ultimately utilized by the Commission and adopted by defendant — is known as the successful schools model (Final Report at 22).[FN4] Instead of looking to specific inputs needed to produce acceptable outputs, this model "looks at the expenditures in school districts that have student performance that meets or exceeds expectations. . . . This analysis is considered to be particularly useful in determining the costs of operating successful school districts because it uses real-world comparisons rather than hypothetical models" (Final Report at 22). At no point in the CFE litigation was the use of the successful schools model challenged.[FN5]
Like the costing-out of a sound basic education, reforms to defendant's system of financing school funding and managing schools have also been undertaken on a statewide basis (see L 2007, ch 57), and these reforms, including the enactment of Foundation Aid, have created a context that is markedly different than that of the CFE cases — one that is necessary to take into account.[FN6] As previously noted, the Court of Appeals has made clear that it is appropriate to consider during the remedial phase of school financing litigation "the extent that recent reforms enable more students to receive a sound basic education" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 927; see Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 29). However, we cannot overemphasize that none of the foregoing should be read to limit the arguments or [*5]documentation that plaintiffs may submit in opposition to defendant's proffered remedy. Indeed, several of the arguments impermissibly raised by plaintiffs for the first time in reply to this Court would be appropriate in rebuttal to defendant's anticipated proposal.
As for defendant's accountability, plaintiffs argue that Supreme Court (O'Connor, J.) must be directed to maintain jurisdiction of this case to allow for subsequent hearings and periodic assessment of whether defendant's ultimate changes are actually providing the at-risk students in the subject districts with the opportunity to obtain a sound basic education. However, in CFE III, the Court of Appeals held that there are now "minimally adequate accountability mechanisms . . . in place for the evaluation of New York schools" (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 32). After satisfactory judicial review of the remedy proposed by defendant, the instant litigation will terminate (see Aristy-Farer v State of New York, 29 NY3d at 508).
To the extent that it is challenged, we note that Supreme Court accurately identified both the applicable standard of review and the issues that remain following our most recent decision. In sum, Supreme Court's intended approach to the remedial phase of this litigation is entirely consistent with both the CFE cases and the directives of this Court.
Lynch, Pritzker, Reynolds Fitzgerald and Powers, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: The Court of Appeals specifically declared that the constitutionally required funding for New York City included additional operating funds in the amount of $1.93 billion, adjusted with reference to a cost index and inflation since 2004; this number was extrapolated from a statewide sum of $2.45 billion (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 29).

Footnote 2: Supreme Court stayed its order pending the determination of this appeal.

Footnote 3: "Inputs" refers to the resources made available to public school children by defendant, which fall into three broad categories: teaching, facilities and instrumentalities of learning (Campaign for Fiscal Equity v State of New York, 86 NY2d at 317). Having established constitutional violations, plaintiffs have already proffered extensive evidence of inadequate inputs in the subject districts (see 196 AD3d at 119-152).

Footnote 4: The successful schools model was also utilized by the aforementioned panel of referees.

Footnote 5: Other aspects of defendant's costing-out were of course challenged, such as the manner by which successful schools were identified, as well as certain weightings for students with disabilities, economically disadvantaged students and students with limited English proficiency (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d at 30-31).

Footnote 6: Contrary to plaintiffs' suggestion, our 2011 decision in this matter affirming the denial of defendant's motion to dismiss on mootness and ripeness grounds does not hold that defendant's major 2007 reforms would be irrelevant at the remedial stage of this litigation (Hussein v State of New York, 81 AD3d at 135-137). Rather, we expressly acknowledged that "defendant may be able to demonstrate that the 2007 legislation will ameliorate the defects and discrepancies that plaintiffs allege exist" (id. at 137).